STATE v. ERNEST MILLS, Appellant.—No. 38834.—179 S. W. (2d) 95.

Division Two, April 3, 1944.

*Corbett & Peal* for appellant.

*Roy McKittrick*, Attorney General, and *John S. Phillips*, Assistant Attorney General, for respondent.

■ ELLISON, J.—The appellant, a nineteen year old boy, was convicted of murder in the second degree by a jury in the circuit court of Pemiscott county for shooting and killing Helen Wright. But they reported in their verdict that they were unable to agree on the punishment and recommended leniency. The court fixed the punishment at ten years' imprisonment in the penitentiary. The assignments of error on this appeal complain of the insufficiency of the evidence and verdict; the exclusion of competent evidence; the giving and refusal of instructions; and improper argument to the jury by the prosecuting attorney.

The facts, in brief, are that appellant and a young man named Robert Overfield were jointly prosecuted by information for the homicide charged. Overfield took a severance, plead guilty to manslaughter and was paroled on the morning of appellant's trial, and testified for the State. The shooting occurred perhaps between 8 and 9 P. M. on December 26—after dark, at least—one of the bullets entering the farm home of Mrs. Mary Wright and killing her 15 year old daughter. That place was on the same side of the road "two light poles" from the home of John Armstrong. Appellant's brief says the distance was 250 feet. There was a good sized barn between them. Armstrong was Overfield's uncle and appellant's ■ great-uncle. The two boys had been in town all day with some of the Armstrong family and others, and there was testimony of some whiskey and beer drink-ing. But the evidence is very weak that appellant was drunk. He testified he had not taken a drink since noon. He had returned to the country and visited in the Wright home about an hour before the shooting; and while Mrs. Wright said on direct examination that appellant had been drinking, yet on cross-examination she admitted he wasn't drunk, and that she was "just going by the rest of them saying they were drinking."

From here on the direct evidence is very conflicting. Overfield testified that after appellant had returned from the Wright home to the Armstrong home, and after they had made a side trip to a neighbor's for some tobacco, appellant proposed that they "scare the widow woman"—referring to Mrs. Wright. Overfield got a .38 caliber pistol and a .22 caliber rifle belonging to John Armstrong, giving the rifle to appellant. Overfield says he went out on a bridge in front of the Armstrong house and fired the pistol in the air twice; and that appellant went down by the fence that led to Mrs. Wright's

home—how far, it was too dark for him to tell. Apparently he didn't hear or see the shots appellant fired. He was silent on that point, but said he didn't know how many shots were fired. He further testified that after the shooting appellant proposed they make up the false story that they were shooting at somebody. He declared he didn't see any prowlers that night. On cross-examination he denied that he and appellant agreed to say they were shooting at ''some prowlers''; but he couldn't remember whether he had made an answer to the opposite effect at the preliminary hearing, when a part of his testimony at that hearing was read to him.

Appellant testified that after returning to the Armstrong home from the Wright home and the tobacco trip, he and Overfield got the rifle and pistol and each fired twice. He denied proposing to Overfield that they scare Mrs. Wright; and started to say ''there had been people prowling around the night before''—when he was stopped by the court upon an objection by the prosecuting attorney ''about the night before.'' Then he stated he and Overfield ''heard something outside,'' got the two firearms and on coming outside he ''seen him, and seen the bulk of him and shot out in the dark.'' He declared he was ''shooting at a prowler, the man that ran off;'' and denied making up a false story to that effect with Overfield. He further disclaimed any intention to injure any one in Mrs. Wright's house. On cross-examination he said the man was running toward the ditch in the direction of Mrs. Wright's home; and that he shot from in front of the Armstrong house in the corner of the yard or lot. The barn stood back of a line between the Armstrong front yard and the Wright home—so, evidently, it would not be in the course of a bullet fired from the former point toward the latter. He did not see Mrs. Wright in the doorway with a light in her hand; and did not know of the fatal effect of the shots until notified a little later. Constable Michie testified without objection that just before the inquest over the corpse that night, when appellant was asked if he had anything to do with the shooting he answered ''Yes'' and explained he fired the rifle at a burglar in the barn lot in the direction of Mrs. Wright's house. Three witnesses testified to appellant's good reputation as a law abiding citizen.

Mrs. Wright testified the shooting at her house began after she and her children had retired. She got up, lighted the lamp and opened the door. There she saw ''the bulk of someone'' 10 or 15 feet away. She thought it was Ernest Mills (the appellant). But that answer was stricken out and the jury instructed to disregard it because it was merely an opinion without factual foundation. Two shots were fired after the door was opened. The child, Helen, must have been struck by one of these two shots, for she was dressing—standing in a stooped over position buttoning the back of her clothes. The bullet entered the left side of the left breast above the heart and

ranged slightly down, lodging in one of the vertebrae. It was a .22 caliber shot. There were four bullet holes in the bedroom wall. One bullet went through the stove pipe about 3 feet above the floor and one was found on the floor. These also were .22 caliber, so all must have come from appellant's rifle.

When appellant was notified of the girl's death by Odell Armstrong, who was passing by the Wright home, he with other neighbors got a truck to which he carried her, and took her to a doctor in Steele. Appellant offered to prove by a Miss Cole that ▆ the night before the shooting she was at the Armstrong home, "and that she and her little sister Katie Armstrong were in the back room and someone opened the door and the girls went running through the house screaming and then two of the boys went outside with their pistol and shot at someone they heard running off from the place, and that Odell Armstrong came in and had a long place cut in his coat under his arm, and said that he ran into someone outside and whoever it was cut his coat as they ran off." The offer further sought to prove appellant was there at the time and heard this statement. Odell Armstrong was a son of John Armstrong and appellant was staying in the latter's home at the time. A further offer was made to prove the same incident by another witness, J. C. Mosley. The court sustained the State's objection that the facts sought to be shown were outside the res gestae and hearsay.

▆ Appellant complains that the foregoing evidence was insufficient to sustain a verdict of second degree murder because it wholly fails to show any motive for the shooting and negatives an intent on his part to shoot the deceased. But proof of a motive was not indispensable. State v. Hughes, 344 Mo. 116, 124, 125 S. W. (2d) 66, 70(7). And it is well settled that if one recklessly and maliciously shoots into a house where he has reason to believe people are who may be hit by his bullet, his act imports a criminal intent and malice sufficient to constitute murder. State v. Layton, 332 Mo. 216, 222(6), 58 S. W. (2d) 454, 457(6).

▆ But the assignment seriously pressed is that at most appellant's act was merely culpable negligence and therefore only manslaughter under Sec. 4382,[1] for which reason the court should have given an instruction on that degree of homicide as a part of the law of the case under Sec. 4070(4). The Attorney General's brief answers that under Sec. 4425, a wilful and malicious shooting into a dwelling house is a felony. And Sec. 4429 declares every house which shall have been usually occupied by persons lodging therein, shall be deemed a dwelling house. Then it is pointed out that under the common law and Sec. 4377 the commission of a homicide in the perpetration of a felony (other than those mentioned in Sec. 4376, the first

---

[1]Citations to our statutes are to R. S. Mo., 1939, and the same section numbers in Mo., R. S. A.

degree murder statute) is murder in the second degree. Thus the State arrives at the conclusion that appellant's act was and could be nothing less than murder in the second degree since he admits the shooting and resultant homicide.

We have considered certain phases of this question in State v. Aitkens, 352 Mo. 746, 179 S. W. (2d) 84, decided concurrently herewith. And we agree that the homicide here was murder as a matter of law if appellant's causative act in shooting into the dwelling house was a felony under Sec. 4425. State v. Robinett (Mo., Div. 2), 279 S. W. 696, 700(VI). But the statute says the shooting *into the dwelling house* must be done wilfully and maliciously to constitute the crime it denounces. If that fact be conceded or found by the jury then the law will supply the malicious intent as to the resulting homicide, and accident or lack of actual homicidal intent will not be a defense.[2]

Yet we do not agree with the Robinett case that if the evidence merely *tends* to prove the antecedent collateral felony, the crime cannot be less than murder (manslaughter). For whenever it is merely a jury question whether the shooting into the house was wilful and malicious, the jury would have a right to conclude it was not, in which event the act would not be a felony. If, as here, there was substantial evidence that the accused was shooting at a fleeing burglar or prowler and unintentionally shot into a neighbor's house and killed someone, it might be only culpable negligence thereby reducing the offense to manslaughter as an independent crime—unless such shooting would be some other kind of a felony to which attention has not been called. If it were a misdemeanor the homicide would still be only manslaughter.

■ We think the appellant's testimony and other evidence in this case entitled him to an instruction on manslaughter. If there was substantial evidence on that lower degree of criminal homicide, it was error for the court to fail to instruct on it, whether requested or not. 15 West's Mo. Dig., sec. 309(4), p. 221. And on that point, we ■ are further of the view that appellant was entitled to prove, if he could, that to his knowledge there had been a prowler or burglar at the same Armstrong home the night before, who had assaulted Odell Armstrong, this to show appellant's motive and the absence of malice. We think the trial court erred in sustaining the objection to appellant's offer of proof along this line, so far as the ruling was based on the res gestae theory, for appellant would not be limited to the res gestae to prove those facts unless the evidence would otherwise be incompetent as self-serving, etc. Neither do we think the objection would be good on a hearsay theory if appellant was present and saw

---

[2]State v. Wieners, 66 Mo. 13, 22; State v. Glover, 330 Mo. 709, 718, 50 S. W. (2d) 1049, 1052, 87 A. L. R. 400; State v. Aitkens, supra (No. 38730), 352 Mo. 746, 179 S. W. (2d) 84.

780

frightened children run into the house and a person who had been assaulted by the prowler. The effect on appellant's mind would be nearly the same as if he had seen the man.

For the reasons stated the judgment is reversed and the cause remanded. All concur.