STATE v. BUFORD COLE, Appellant.—No. 39327.—188 S. W. (2d) 43, 189 S. W. (2d) 541.

Division Two, June 11, 1945.

Motion for Leave to File Motion for Rehearing Overruled, July 18, 1945.

182

*J. E. Taylor*, Attorney General, and *W. Brady Duncan*, Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant, 29 years old, was convicted in the circuit court of the City of St. Louis of murder in the first degree and his punishment assessed by the jury at death, for the killing of a seven year old girl by strangulation in the attempted commission of a rape upon her. Both parties were negroes. On a former appeal the case was reversed and remanded for the giving of an erroneous instruction. State v. Cole (Mo., Div. 2), 174 S. W. (2d) 172. On this second appeal he has filed no brief. We shall

take up the assignments of error in his motion for new trial after stating the facts.

The mother and father of the murdered child were separated. The mother worked away from home during the day. The child sold newspapers after school in the neighborhood of her home. On December 19, 1941, she left home after the supper hour to resume her work and had not returned by 11 P. M. A search was instituted, and the child's absence reported to the police about 1 A. M. Her corpse was found between 5 and 6 A. M. in the corner of a fence in the alley at the rear of 2624 Lawton Avenue by a negro Silas Millan, who notified the police. He had died since the first trial and his testimony at that trial was read in evidence. The corpse was lying on an ash pile with one leg extending through a hole in the fence. A sick woman in a nearby house heard a child screaming between 10 and 11 P. M. that night.

An autopsy early the next morning indicated death had occurred four to twelve hours earlier. The coat and panties on the corpse were torn and there were blood stains on the crotch of the latter garment together with microscopic evidence of vegetable fiber and gray hair—whether human or not it was impossible to determine. The vagina and hymen were lacerated and vaginal swabs disclosed seminal fluid. Contusions, finger and thumb nail marks were found on the throat.

The thumb nail mark was on the *right* side of the neck. Appellant's counsel sought to show on cross-examination of Dr. Connor that such marks must have been made by the thumb of the *left* hand of the person who inflicted them; and that appellant could not have been the guilty party because, admittedly, his thumb on that hand had been amputated at the base. Indeed, if that hand had been used there would be no thumb nail mark at all. But, even otherwise, it seems counsel's theory is incorrect. When two persons face each other the right side of the body of each is opposite the left side of the other. And if one in that position seize with his right hand the throat of the other, his thumb would be on the inside or left of that hand and would mark the right side of the other's throat. Furthermore, appellant's confession stated he used his left hand in holding the girl's throat; his counsel in cross-examining witness McCreary argued the appellant's hand would have gripped clear around the small throat of the girl; and this witness quoted the appellant as telling him he was behind the girl and struck her, she screamed, and he seized her neck and face with *both* hands. There is nothing in this evidence excluding the appellant as the possible perpetrator of the homicide.

Silas Millan, who discovered the corpse, was first held by the police for the crime about ten days. He was 61 years old, gray-haired and feeble. He was porter at a hotel in the same block, and

stored junk and slept in the summertime in a shed at the rear of 2612 Lawton Avenue, just twelve doors from where the body was found. But he testified that on that night he had slept at a house in the 2700 block where a woman friend lived. He regularly went to and from work through the alley to pick up empty bottles, which he sold for junk. When he passed that way the evening before about 7 P. M. the corpse was not there. The particular reason that suspicion had attached to him was that small blood spots were found on the front and upper part of his coveralls, shirt, underwear and overcoat. There was a small bottle of vaseline in the overcoat pocket. Millan accounted for the blood spots by the fact that he had had a tooth extracted on December 11, because of which the gum had bled for three days up to December 14 (five days before the homicide) during which time he had expectorated on his clothes, including the shirt and underwear he wore at night.

Bearing on this point, laboratory blood tests showed that fresh blood obtained from the appellant was in group ON; blood taken from the panties of the corpse was in group O; and blood scraped from the spots on the clothes of Silas Millan also was in group O. Thus it appeared the blood on the garments of the deceased and of Millan were in the same group O, the commonest group, whereas the fresh blood taken from the appellant was in group ON. But the bacteriologist, Dr. Gradwohl, explained that blood types M or N might be found in combination with any of the four groups designated A, B, O and AB if the blood were fresh, but could not be identified if the blood had dried. As a matter of fact blood taken from stains on the knee of the appellant's white trousers (of which later) also was in group O; whereas the blood stains on Millan's clothes were up around the shoulders and chest. Furthermore, the particular type of appellant's blood does not seem important since there was no blood letting from him; and the question was whether it was the little girl's blood on his pants.

As stated earlier, the police abandoned the theory of Millan's connection with the crime and began to investigate the appellant. The first clue pointing to him apparently came from the secretary and a cook named Inez Jones at the Railroad Y. M. C. A., 20th and Eugenia Streets, St. Louis. Both of them testified at the trial. This address, appellant's room at 23 A. North Jefferson Avenue, and the scene of the crime all were in the same general neighborhood west of Union Station. Appellant had worked as a bus boy at the Y. M. C. A. cafeteria for about three weeks before the date of the homicide, in which employment he wore a white jacket and pants. His working hours ordinarily ended at 3 P. M., but that night about 11:45 P. M. he came to the kitchen and asked the cook for a sandwich. Presently he attempted to depart by the back door, which was locked and not used by the kitchen help. Where he went next the cook didn't know,

but the following morning before 9 o'clock he left his employment without explanation, although he had $2 or $3 wages due and owed the secretary $5.

Appellant's father and brother lived in St. Louis and his wife and child on a farm near Sikeston, Missouri. He did not explain to the former his sudden departure; or go to the place where he roomed although he had clothes there; and he could not be located at Sikeston. He also had relatives in Crockett County, Tennessee, as was disclosed by his prison record, he having completed a two year sentence for felonious assault in the Missouri penitentiary in 1936. Being advised of these facts, or many of them, sergeant Middlebrooks of the St. Louis police communicated with the sheriff in Tennessee. The latter apprehended appellant and sergeant Middlebrooks went there and brought him back to St. Louis on the train. Witness McCreary, who was a newspaper reporter on the St. Louis World also went on that trip. Appellant confessed the crime to both of them, in detail.

The party arrived in St. Louis about 9 or 10 P. M. and appellant was put in jail. The next morning about ten o'clock the police called in Nathaniel A. Sweet, publisher of the St. Louis American, a newspaper for negroes; E. M. Davis, his city editor; and C. W. Roberts, an undertaker, all members of appellant's race. They, together with assistant circuit attorney James Connor, sergeant Middlebrooks, and officers Lower, Taylor, Underwood and Gray, were present when appellant made and signed a written confession at the police station, and took them to the scene of the crime.

Appellant's counsel objected to the introduction of the confession, the jury was excluded, and evidence was introduced concerning its voluntariness. On this point all of the nine witnesses to the confession testified, except officer Gray and city editor Davis. It was admitted that the latter was "in the south sea." All said the confession was made by appellant as shown therein without any claim of coercion or physical violence, except that assistant circuit attorney Connor thought he remembered appellant at some time said the sheriff in Tennessee had slapped him. Mr. Sweet, the publisher, read the confession to the appellant before he signed it. Sweet further declared he "moved over opposite" the appellant, who appeared to be an average individual, and said, "You can tell me the truth, did anybody hit you?"; and appellant answered, "No, I want to get this off of my chest." These witnesses all stated on cross-examination that they did not know whether appellant had been beaten by the police the night before, because they had not been at the police station through the night. But they declared appellant said he had not, and that he showed no physical evidence of it. And it was proven that no one could have entered the cell where he was confined except by going through two locked doors in charge of a turnkey.

Appellant offered no controverting evidence, the jury was called back, and the confession was admitted in evidence over his general and specific objections that it failed to show he had not been beaten during the night of his return to St. Louis and failed to connect him with the crime. The confession was in question and answer form, and signed as witnesses by all the nine persons mentioned in the second preceding paragraph. It shows that at the outset assistant circuit attorney Connor informed appellant he could not be compelled to make a statement; that no promises could be held out to him; and that anything he said could be used against him. Appellant expressly stated therein that he had not been beaten or threatened. Then one of the officers (apparently Middlebrooks) took up the questioning. Without reciting the revolting details, the appellant confessed that he had lured the little girl into the alley and choked her at the place where her body was found, with the intent of raping her, but that he was scared away by the approach of somebody.

Thence he went to a tavern, bought wine, and washed the blood off his right hand; and from there to another tavern where he bought beer for himself and a girl. Then he went to the Railroad Y. M. C. A. about 10:30 or 11 o'clock P. M., got something to eat, and tried to leave by the kitchen door as the cook, Inez Jones, had testified. He slept that night in the basement of the Y. M. C. A., and worked the next morning (December 20) until about 8 o'clock, when he told James Marks, a boy employed there, that he was going to East St. Louis and get a better job. (In this he was corroborated by Marks.) He put on his street clothes over his white uniform and left, his real purpose being to see his wife and child near Sikeston before he got caught. That afternoon he "rode the freight" to Sikeston, and slept that night in a barn in the neighborhood of his wife's home. But he did not see her or his child, and early the next morning rode another freight to Jackson, Tennessee, where he visited his uncles and cousins in the country. He was picked up by the sheriff on January 9. So much for the confession.

When appellant testified at the trial he was examined and searchingly cross-examined at great length. He admitted the incident at the railroad Y. M. C. A. the night of the homicide; and that he tried to go out the locked kitchen door. But he said that was because he had drunk some soda which made him sick. He further admitted sleeping in the Y. M. C. A. basement that night and his unexplained departure the next morning direct for East St. Louis. Further, he agreed that he was wearing the white pants of his Y. M. C. A. uniform as underwear under his regular pants when arrested in Tennessee because it was cold, these being the ones from which the blood sample was taken. However he said he took off his uniform the night he slept in the basement, and that the white pants he put on the next morning and wore thereafter may not have been the same

ones he had worn the previous evening. He declared he didn't remember that there were bloodstains on them, and that sergeant Middlebrooks didn't claim there were until after he had taken charge of them. Middlebrooks and officer Lower said appellant at first explained the bloodstains were from chicken blood picked up while he worked at the Y. M. C. A. Appellant insisted he said they *might* be.

He denied his guilt and interposed an alibi as follows. The afternoon before the homicide he quit work about 3:30 o'clock and went to his room and changed clothes. Then he went to a tavern about 6:30 P. M. and spent some four hours there talking to a woman named Laura until about 10 or 10:30. He gave another woman $1 to buy a bottle of beer and she left the place without giving him his change. He followed her to some kind of a factory and demanded his money. A man handed it to him and he returned to the tavern where he was warned that a man was angry, apparently about the above incident, and was looking for him. He left and some man in a brown Buick pulled up to the curb and started to get out but was restrained by fellow passengers, including a white woman. Appellant then fled and went to the Y. M. C. A. following which occurred the incidents at that place. He went to East St. Louis partly because he feared this man and partly to get a better job because of union labor activities at the Y. M. C. A. The first named woman, Laura Williams, corroborated appellant, saying he was in the tavern where she worked until about 10 P. M., and that he bought beer for another woman, and also bought whiskey.

He further said he went direct from East St. Louis to Tennessee on the Illinois Central Railroad and denied detouring via Sikeston, Missouri. He declared the Tennessee sheriff whipped him twice with a large rubber hose, with a 20 minute interval in between, to make him confess; that sergeant Middlebrooks slapped him twice in Tennessee but inflicted no violence on him afterward; and that during the night after his return to St. Louis two policemen took him from his cell to the police station basement and whipped him twice with a smaller rubber hose, with a 20 minute interval in between, to make him confess. He did not say they were among the officers present when he made his written confession. The next morning, he said, sergeant Middlebrooks brought his (appellant's) brother in to see him for a short time and the latter brought him some barbecued ribs. He told his brother about the beatings, but the brother did not testify. Later Middlebrooks took him before the police Captain and told him he would be whipped again if he did not confess, whereupon he did so, telling the story (mostly) as he had heard Middlebrooks relate it to the Tennessee sheriff, or as Middlebrooks prompted him or the reporter at the time. He stated that when he went to the scene of the crime with the group who had heard his

.confession, he was handcuffed to Middlebrooks, who led him instead of his leading the party.

With reference to appellant's disposition to tell the truth and his mentality. His direct examination by his own counsel was leading and his story improbable. He said he could sign his name but could not read, and had gone to school only around the second grade. He had originally come from Tennessee, but had lived in St. Louis from time to time for a number of years. During those years he had been employed at a filling station at 21st and Market streets for several months in 1941 greasing, washing and servicing motor vehicles and selling gasoline, in a satisfactory manner the employer testified. He worked for the Burkhardt Manufacturing Company in North St. Louis in 1936 and part of 1937; and also for Sam Gollub on Broadway and Market as a porter and shoe shiner in 1937 and 1938. It was stipulated Mr. Gollub would testify these services were satisfactory. After that he worked as a houseman and general servant for six or seven months at Hawthorne Hall, 5526 Cabanne Avenue, a private school mostly for female children under fifteen years of age (see State v. King, 342 Mo. 975, 982, 119 S. W. (2d) 277, 280). All this is mentioned as bearing on his mentality and ability.

█ In logical order, the first assignment of error is that the trial court erred in overruling appellant's "challenge to the array on the ground that in the selection of jurors, it was not possible for any woman jurors to be on the panel." The trial occurred in January, 1944. But not until the adoption of Sec. 22, Art. I, Const. 1945, in March of this year were women qualified to serve on petit juries in this State. Sec. 28, Art. II, Const. 1875. So there is no merit in this point. 31 Am. Jur. sec. 88, p. 620, sec. 127, p. 653; 35 C. J. sec. 178, p. 245. If the foregoing assignment refers to the grand jury, and not the petit jury, the same ruling must be made. Under Sec. 28, Art. II, Const. 1875, a grand jury was composed of twelve *men*. Women ("citizens") were not qualified for that service until the adoption of Sec. 16, Art. I, of the Constitution of 1945.

█ █ █ The next assignments are that the trial court erred in refusing to sustain appellant's demurrers to the evidence at the close of the State's case and the whole case. We have reviewed the evidence at some length and need only say we think it was sufficient. State v. Cole (Mo., Div. 2), 174 S. W. (2d) 172. Appellant makes two specific sub-assignments under this head. The first is that his written confession was coerced through severe beatings by the police. He did testify to that, but there was abundant evidence to the contrary—not only from the witnesses to his confession and his statements therein, but from the physical facts as well. The second sub-assignment is that the State's medical testimony showed the deceased child had actually been raped, whereas appellant's confession introduced by the State said he was interrupted and failed to

accomplish the rape. It is immaterial whether the actual rape was perpetrated, since the prosecution was for murder and appellant's confession, the physical facts and medical testimony showed he had ▮▮ caused her death by strangulation, at least in an attempted rape. See Sec. 4376, R. S. 1939 and Mo., R. S. A.

▮ Next it was assigned in the motion for new trial that the verdict of the jury was "based upon bias and prejudice against this defendant, because of the type and nature of the crime, rather than because of the evidence produced against him." It is true that in prosecutions upon a charge for which there is human abhorrence, the trial must be conducted with scrupulous fairness. State v. Richardson, 349 Mo. 1103, 1114(6), 63 S. W. (2d) 956, 962(13). But appellant does not point to anything occurring during the trial which violated this rule, such as improper argument, abuse, or other conduct calculated to arouse the passion and prejudice of the jury against him, outside of the facts themselves. And obviously if the mere aggravated type and nature of the crime alone would justify a reversal of the cause there never could be a prosecution for such crimes.

▮ Another assignment closely related to the above charges that the trial court erred in failing to grant a new trial on the ground of newly discovered evidence. This new evidence is set out in identical affidavits of three persons attached to the motion for new trial, which severally state that the respective affiants were present among the many spectators during the three day trial of the case; that the spectators were extremely hostile to appellant and were almost constantly speaking audibly concerning him, uttering such expressions as, "I am going to stay in this court room until the jury gives him the death penalty, and nothing (less than) the death penalty will satisfy me." It is further stated that some of these spectators were within ten feet of the jury; and that it is entirely possible, and the affiants believe probable, such utterances were heard by the jury during the trial.

If such turmoil was going on during the three days of the trial within ten feet of the bar, it is passing strange that the trial court, the bailiffs and counsel did not become aware of it. At best the affidavits merely express the opinions of the affiants, and the question would have rested largely within the knowledge and discretion of the trial court if it had been raised. If appellant and his counsel did know of any such prejudicial disorder but failed to complain and gambled on the verdict, it would be no ground for new trial. The motion is not verified either by appellant or his counsel, and there is no showing as to when this new evidence was discovered or that diligence was used to discover it. This was necessary and the assignment must be overruled. State v. Lakin (Mo., Div. 2), 177 S. W. (2d) 500, 501(8).

■ Another assignment complains that the trial court erred in refusing to permit the appellant to use Dr. James H. Connor and Dr. R. H. Gradwohl as witnesses on his case although they had been subpoenaed in his behalf and an offer of proof had been made as to what they would testify to. Dr. Connor was a Coroner's physician and testified for the State. He was cross-examined by appellant's counsel. We do not find that he was called as a witness for the defense. Dr. Gradwohl was a bacteriologist and pathologist and head of a private laboratory. He did testify as a witness for the defense. He had examined appellant's blood and the bloodstains on the various garments heretofore mentioned, and made reports to the police on the types of blood found in each, as heretofore stated. These reports were not official documents. Appellant's complaint at the trial was merely this: he sought, but was not permitted, to introduce the reports themselves as well as the testimony of the doctor based thereon. It was not shown that they tended to vary his testimony. We are unable to find any merit in this assignment.

■ Still another assignment charges error in the giving of instruction No. 2 because it contained comments upon the testimony in the case and singled out ''certain unfavorable testimonies against the defendant'' to the exclusion of other material facts. In substance, the instruction told the jury that if they found the appellant suffered abuse, questioning and physical violence at the hands of the police and was thereby caused to make the oral and written statements shown in evidence, then the statements were illegally obtained and should be ignored and rejected by the jury. This was in appellant's favor. There was nothing in the instruction of which he can complain.

■ Complaint is made also in the motion for new trial that the trial court erred in failing to give a cautionary instruction directing the jury to consider the possibility of the guilt of Silas Millan, in view of the fact that the blood stains ■ on his clothing were in the same blood group as that of the deceased child and the appellant, and in view of the further fact that the State's case ''was based purely on circumstantial evidence.'' This latter statement was wholly incorrect: the appellant had confessed the crime. Such an instruction was not a part of the law of the case, on which the State was required to instruct under Sec. 4070(4), R. S. 1939 and Mo., R. S. A. And appellant neither offered nor requested any instructions—if such an instruction would have been proper at all. This assignment is overruled.

■ The final assignments are that the trial court erred in overruling the appellant's motion that a machine called a lie detector be used in the reception of the testimony of the witnesses for the State and defense; and in excluding expert testimony as to the effectiveness of the machine. This motion was made and overruled

at the beginning of the trial before any witness had testified. Later, after four witnesses had left the stand, appellant presented detective sergeant Cartjoin of the St. Louis Police Department as an expert witness in support of his motion, the jury being excluded. He testified to his familiarity with lie detectors.

But when he was asked to explain how the machine works, the court sustained the State's objection on the ground that any evidence illicitly obtained thereby would have no probative value recognized by the courts of this State. Appellant excepted, and made an offer of proof that the lie detector "is a sort of mechanical device" which registers the fact whether a witness is testifying truthfully or falsely, thereby assisting the jury; that it is used by the St. Louis Police Department and other modern police departments throughout the United States; and was used in at least one court case in New York. The offer was rejected. In the same connection appellant's counsel stated appellant "is willing" to submit himself to that method of examination, if permitted to do so.

It is to be remembered that the question here is not one of the privilege of an accused against self-incrimination. The appellant announced he would waive that, so far as concerned the use of the machine on himself. Neither is it a question of his right to introduce evidence showing how the witnesses had reacted to the machine when previously examined extrajudicially. Appellant's motion was made at the very beginning of the trial, and contemplated the compulsory use of the machine on all the witnesses during the trial before the jury.

The case law on this subject is meager as shown by the decisions cited below.[1] There are none from Missouri. We find no case where the machine was used before a jury, although in the Frye case the defendant offered to submit to such a test. Neither do we find a case where it was used outside of court without the consent of the witness. See 8 Wigmore on Evidence (3 Ed.) sec. 2265, p. 384. It is held in the three Wisconsin cases cited that even where the defendant has submitted himself to the test, the findings of the expert who conducted it and the questions asked and answers made by the witness cannot be shown in evidence.

[1] 3 Wigmore on Evidence (3 Ed.) sec. 998, p. 641, sec. 999, p. 644; 8 ibid., sec. 2265, p. 384; 3 Wharton's Criminal Evidence (11 Ed.) sec. 1429, p. 2338; Frye v. U. S., 54 App. D. C. 46, 293 Fed. 1013, 34 A. L. R. 145, 147, note; State v. Bohner, 210 Wis. 651, 216 N. W. 314, 86 A. L. R. 611, 616, note; People v. Kenny, 167 Misc. 51, 3 N. Y. S. (2d) 348; People v. Forte, 4 N. Y. S. (2d) 913, 919(3), 279 N. Y. 204, 18 N. E. (2d) 31, 119 A. L. R. 1198, 1200, note; Commonwealth v. Jones, 341 Pa. 541, 19 Atl. (2d) 389; People v. Becker, 300 Mich. 562, 2 N. W. (2d) 503, 139 A. L. R. 1171, 1174, note; LeFevre v. State, 242 Wis. 416, 8 N. W. (2d) 288, 292(1); State v. Dehart, 242 Wis. 562, 8 N. W. (2d) 360, 362(2), 364(7); Bruner v. People, 113 Colo. 194, 156 Pac. (2d) 111, 118-120.

There is no decision in which it was held error to refuse to admit evidence of such examinations, even of the defendant himself and at his request, except the Kenny case, decided by a New York county court.. The Frye, Bohner, Forte and Becker cases all held there was not sufficient scientific recognition of the efficacy of the machine to warrant the judicial acceptance of its recordings as evidence of the truth or falsity of the testimony of the subject witness; although it is said in the annotation in 139 A. L. R. 1174, supra, that there were more or less direct implications in the Forte and Becker cases that if a proper preliminary showing along that line could and had been made the evidence might be admissible. In the LeFevre and Dehart cases from Wisconsin and the Bruner case from Colorado, the opinions show the machine was used extrajudicially on the defendant at his request.

A lie detector machine, or some part of it, is strapped on the witness and records by a needle on a graph his varying emotional disturbances when answering questions truly or falsely, as disclosed by fluctuations in blood pressure, respiration or perspiration. One of phlegmatic temperament or subnormal mentality reacts to the machine less than one who is mentally alert, because its functioning depends on his emotional responsiveness. In other words, the individuality of the person makes a difference. The influence governing the emotion is secret repose or fear. 3 Wigmore on Evidence (3 Ed.) sec. 699, pp. 646-9. In our opinion the day has not come when all the witnesses in a case can be subjected to such inquisitorial and deceptive tests (or to drugs like scopolamine, or to hypnotism) without their consent. Furthermore, such dramatics before the jury would distract them and·impede the trial—this latter also because it is necessary for the inquisitor to ask both harmless, irrelevant and "hot" questions in order to bring out the contrast in the witness' emotional responses. No doubt the lie detector is useful in the investigation of crime, and may point to evidence which is competent; but it has no place in the court room.

The only question remaining is whether it was error to refuse the appellant's request that *he* be subjected to the lie detector test. Strictly speaking, he did not make a motion to that effect: he merely said he was "willing" to have the test made. But on either view, we are satisfied that no error was committed by the trial court for two reasons: (1) first because, as we have held, such tests should not be made before the jury during the trial; (2) and because appellant's offer of proof did not show that method of detecting guilt had sufficient scientific support. His counsel said the machine was used by the St. Louis Police Department and other modern police departments throughout the United States, which may be true in preliminary investigations. But he did not say its use had wide scientific approval as a producer of judicial proof, nor are we persuaded that it has. The

"one New York court case" referred to by counsel evidently was the Kenny case, which has not been followed since. And so we conclude this assignment should be overruled.

██ On two other points, not mentioned in appellant's motion for new trial. The record fails to show he was formally arraigned. But under Sec. 4004, R. S. 1939 and Mo., R. S. A. that omission is not a fatal defect. Furthermore, this was a retrial of his cause, his first conviction having been reversed and the cause remanded. State v. Cole, supra, 174 S. W. (2d) 172. Before the former trial he was arraigned. No second arraignment was necessary even though the statute be ignored. State v. Jennings, 278 Mo. 544, 552(4), 213 S. W. 421, 423(4).

██ The indictment was in the usual form, charging a wilful, deliberate, premeditated and malicious murder by choking and strangulation. This was sufficient to support a conviction of homicide committed in the perpetration, or attempted perpetration of a rape in violation of the latter part of the murder statute, Sec. 4376, supra. State v. King, 342 Mo. 1067, 1072(1), 119 S. W. (2d) 322, 324(2).

The appellant was accorded allocution and we find no error in the record proper. The judgment is affirmed and under Sec. 4153, R. S. 1939 and Mo., R. S. A. the sentence ordered executed. All concur.

Date of execution set for July 27, 1945.

## ON MOTION FOR LEAVE TO FILE MOTION FOR REHEARING.

██ ██ PER CURIAM:—Through new counsel recently employed and who did not participate in the trial below, appellant has filed a motion for leave to file out of time a motion for rehearing, the latter motion being submitted with the former. The opinion in this case, affirming the judgment and sentence of the circuit court and ordering its execution, was filed on June 11. Under Rules 1.19 and 1.27, any motion for rehearing should have been filed within fifteen days thereafter, which would have been on or before June 26. The instant motion, with accompanying motion for rehearing, was not filed until July 5, and therefore comes nine days too late.

██ But since the death penalty has been assessed we have examined the motion for rehearing nevertheless. The only ground for rehearing assigned therein is that the trial court erred in failing to give an instruction on manslaughter, without request, as a part of the law of the case, under Sec. 4070(4), R. S. 1939 and Mo., R. S. A., and State v. Aitkens, 352 Mo. 746, 762-3, 179 S. W. (2d) 84, 94(26). In that case the defendant admittedly placed her hand over the mouth of an infant, smothering it to death. But she asserted she had committed the assault merely to stifle the cries of the infant and not with the intention of killing it. The decision held the prolonged, fatal suffocation of the infant would not be accidental or excusable

homicide even though there was no actual intent to kill; and would, or could, at least constitute an assault and battery with intent to do bodily harm, calling for an instruction on manslaughter since the homicide was committed in the perpetration of that assault.

Appellant's counsel reasons that on the same theory a manslaughter instruction should have been given in this case. But here the appellant killed the deceased in the perpetration of a rape, or an attempted rape according to his own confession, as proven by the State. At the trial the appellant's sole defense was an alibi. He made no issue whatever as to his intent to ravish—if he did commit the assault. And Sec. 4376, R. S. 1939 and Mo., R. S. A. expressly declares a homicide committed in the perpetration or attempted perpetration of any rape shall be deemed murder in the first degree. It is immaterial whether the rapist did or did not intend that his assault upon the seven year old girl should result fatally, if death was a natural and proximate result of the act. The law supplies the essential ingredients of the murder, such as malice, deliberation, premeditation. State v. Glover, 330 Mo. 709, 718-9, 50 S. W. (2d) 1049, 1052-3, 87 A. L. R. 400; State v. King, 342 Mo. 1067, 1072(1), 1075(5), 119 S. W. (2d) 322, 324(2), 326(8); State v. Mills, 352 Mo. 774, 779, 179 S. W. (2d) 95, 97(3).

The foregoing being true, it would avail nothing if appellant's motion for rehearing were filed. The motion for leave to file that motion is overruled.