[Crim. No. 4435. Second Dist., Div. Two. June 16, 1950.]

THE PEOPLE, Respondent, v. WALLACE A. H. WOCHNICK, Appellant.

Ellery E. Cuff, Public Defender, Noel B. Martin, Deputy Public Defender, for Appellant.

Fred N. Howser, Attorney General, Dan Kaufmann, Deputy Attorney General, for Respondent.

WILSON, J.—Defendant was charged with the murder of one James Kibrick. He pleaded not guilty and on a trial

before a jury was convicted of murder in the first degree and was sentenced to the state prison for life. His motion for a new trial was denied. This appeal is from the order denying the motion for new trial and from the judgment.

The only ground for appeal assigned by defendant which we need to consider is that the trial court erred in admitting testimony of the details and results of a lie detector test to which defendant had been subjected.

Kibrick received the injuries which caused his death in his liquor store on the corner of Temple and Fremont Streets in the city of Los Angeles. He had been severely beaten and cut, apparently with broken liquor bottles, about his face, head and hands and although those injuries alone would have probably caused his death, the immediate cause was a wound from a knife which had been plunged into his chest, piercing his heart. The knife belonged to the victim and was customarily kept beside the cash register.

Philip Anast testified he called at the liquor store to make a delivery and saw the victim lying on his back behind the counter in a pool of what seemed to be blood and other liquid; that defendant was straddling the legs of the victim in a more or less squatting position and it appeared to him as if defendant was just releasing the shirt front of the person on the floor. Defendant told the witness the man had been beaten and Anast ran out to call the police. When he returned to the store the victim was sitting in a chair between the counter and the shelves. He arose as they entered and Anast noticed what seemed to be a cigar butt protruding from the victim's shirt. He later identified the object as the taped handle of a knife.

Defendant testified that when he entered the store he saw no one; he turned to look back whereupon a man brushed by his right side and hit his shoulder and went past him toward the open door; he heard a moan which came from behind the counter; he looked over the counter and saw a man lying in the alleyway between the counter and the shelving and he went around to assist; he straddled and kneeled on one knee over the man and brushed the glass from under his hands and from his neck and endeavored to lift the victim to a sitting position; as he did so he noticed a big gash in the man's neck and decided it was a matter for the police and a doctor; as he stood up he noticed Anast.

At the time of trial defendant testified he did not see the

knife protruding from the vicinity of Kibrick's heart as he bent over him but in a statement previously given to one of the officers he said that when he brushed the glass off Kibrick he felt an instrument.

Defendant assigns as error the admission, over the repeated objections of his counsel, of the evidence of Officer Zander in which he repeated a conversation between himself and defendant. The officer testified that he told defendant he had been placed on the lie detector for a test; that defendant having dealt with machinery the major portion of his life he was sure defendant would understand that a certain motivating force brings a certain effect provided the machinery is in operating order; he then explained to him the workings of the polygraph or lie detector; that it was a machine manufactured to register reactions, respiratory rate, pulse rate, and certain electrical emanations from the body and upon a basis of those factors the machine drew a graph from which certain conclusions could be drawn; that it is based on the premise that it takes more effort to state an untruth than it does a truth and that the effort is reflected on the graph; he stated to defendant that when he was asked his age, address and questions of that nature he of course answered truthfully and his answers established on the machine a normal indication of the effort required to answer truthfully a normal question; that defendant had said at one time that the reason he went into the store was because he noticed a similarity between his name and that of the person who conducted the store, yet when the operator of the machine gave him various names and he came to the name of the victim there was no indication on the graph that he had ever heard or seen that name before or had any knowledge of it; he said to defendant that they showed him five knives, one of which was the knife that was removed from the body of the victim; the operator showed him one knife at a time and asked him if he had ever seen that knife before and in each instance defendant stated he never had; when they showed him the knife that was removed from the body of the victim there was a violent reaction on the graph of the machine which indicated that his answer was an untruth; they showed him the same five knives again; the operator would take a knife from the drawer and lay it on the table in his hand; the second knife shown him was the knife removed from the body of the victim; in this instance the reaction was normal on the graph and the operator looked up and saw defendant had his eyes closed; the operator said nothing but continued to tap the table with

his empty hand and would ask him if he had seen this knife before and the graph indicated a normal reaction; then when he had repeated that method five times he asked defendant to open his eyes, held the knife in front of him and asked him the same question again, showing him each individual knife; the reaction was the same as it was the first time the knives were shown him—when they exhibited the knife that was removed from the body of the victim there was a violent reaction on the graph indicating a guilty knowledge. The officer testified he then stated to defendant: "Mr. Wochnick, if you can explain these things to me—maybe you have a logical explanation. Maybe you have an explanation you have not told me about yet. If you can explain these things to me, I wish you would. Maybe the whole thing is wrong"; defendant answered, "Mr. Zander, I cannot explain that."

Defendant contends that by the introduction of the foregoing testimony under the guise of an accusatory statement, the prosecution was able to place in evidence the damaging and prejudicial results of the polygraph or so-called lie detector; that the results of such a test are not admissible as evidence and it was therefore prejudicial error to admit them indirectly in the form of a purported accusatory statement.

The question of the admissibility in evidence of the results of the polygraph or so-called lie detector test has not been decided in this state. In the case of *People* v. *Houser*, 85 Cal.App.2d 686 [193 P.2d 937], such evidence was admitted pursuant to a signed stipulation and the court stated the defendant could not on appeal assert that the results of the tests were inadmissible as evidence. In other jurisdictions the courts, with but one exception (*People* v. *Kenny*, 167 Misc. 51 [3 N.Y.S.2d 348], which was not appealed), have uniformly sustained the trial court's rulings in refusing to admit evidence of such examinations. In *Frye* v. *United States*, 293 F. 1013 [54 App.D.C. 46], *State* v. *Bohner*, 210 Wis. 651 [246 N.W. 314, 86 A.L.R. 611], *People* v. *Forte*, 279 N.Y. 204 [18 N.E.2d 31, 119 A.L.R. 1198], and *People* v. *Becker*, 300 Mich. 562 [2 N.W.2d 503, 139 A.L.R. 1171], the defendants sought to introduce in their own behalf evidence of lie detector tests. The courts in these cases all held there was not sufficient scientific recognition of the efficacy of the machine to warrant the judicial acceptance of its recordings as evidence. In *State* v. *Cole*, 354 Mo. 181 [188 S.W.2d 43, 189 S.W.2d 541], a motion was made by defendant that the lie detector machine be used in

testing the truth of all witnesses. The court stated that while no doubt the lie detector is useful in the investigation of crime and may point to evidence which is competent, it has no place in a courtroom.

In *State* v. *Lowry,* 163 Kan. 622 [185 P.2d 147], following a first trial the court suggested to both the complaining witness and the defendant that they submit to a lie detector test before the second trial. The test was submitted to by both parties but there was no agreement that the results might be used as evidence. The outcome of the test was admitted at the second trial over the defendant's objection and on appeal the court stated (p. 151 [185 P.2d]) : ''We are not ready to say that the lie detector has attained such scientific and psychological accuracy, nor its operators such sureness of interpretation of figures on a dial that the testimony here in question was competent, over objection, for submission to a jury holding the fate of the defendant in its hands. . . . The conclusion here reached is in line with the almost unanimous holding of other courts and with the conclusions of law writers generally.''

We are in accord with the views expressed in the foregoing cases that ''the systolic blood pressure deception test for determining the truthfulness of testimony has not yet gained such standing and scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory.''

Respondent argues that the results of the lie detector test were not placed before the jury; that the mere fact that the occasion for the conversation between defendant and a police officer was the giving of a lie detector test would not require the exclusion of such conversation if it were otherwise admissible and that moreover the trial court specifically instructed the jury it could not consider that portion of the conversation relating to the lie detector test as indicating whether or not there was any reaction to any technical test.

Despite the instruction of the court, the evidence of the partial results of the lie detector test with respect to defendant's reaction upon being shown the murder weapon was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect.

Not only was the evidence of the results of the lie detector test inadmissible but the testimony should have been rejected upon the further ground that it did not constitute an accusatory statement. The witness related that he told defendant some of the evidence had not been satisfactorily explained;

that a number of questions had been asked as to his name and address and other questions of that nature which the machine indicated he had answered truthfully but when certain other questions were put to him there was a violent reaction on the graph of the machine indicating his answers were untrue; he thereupon stated: "Mr. Wochnick, if you can explain these things to me, I wish you would. Maybe the whole thing is wrong"; defendant answered: "Mr. Zander, I cannot explain that."

Accusatory statements and the defendant's response thereto are admissible under an exception to the hearsay rule, as an admission, if the defendant's conduct or response is such as to give rise to an inference of acquiescense in the truth of the statement or guilty consciousness. The statement is admitted not as substantive evidence but merely as a basis for showing the accused's reaction to the questions or his response thereto were not consonant with those of an innocent man. There was nothing equivocal or evasive in defendant's reply. Officer Zander referred to defendant's occupation as an engineer and stated that having dealt with machinery the major portion of his life he would understand that a "certain motivating force brings a certain effect provided the machinery is in operating order." He explained the *modus operandi* of the lie detector test and enumerated the instances in which the violent reaction of the graph in the machine indicated defendant was not speaking the truth. He then asked defendant if he could "explain these things." Defendant made a most natural reply which was that he could not explain it. There was nothing in defendant's answer which would indicate either acquiescence in the truth of the statement or a consciousness of guilt and the court therefore erred in admitting the evidence as an accusatory statement. Furthermore, the admission into evidence of this testimony placed before the jury the result of the lie detector test, which in itself was inadmissible for the reasons hereinabove stated, and constitutes prejudicial error.

Judgment and order reversed and cause remanded for a new trial.

Moore, P. J., and McComb, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 13, 1950.