**STATE of Missouri, Respondent,**

v.

**Bobby Lee SHULER, Appellant.**

**No. 57044.**

Supreme Court of Missouri, Division No. 2.

Nov. 13, 1972.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Miller, Fairman, Sanford, Carr & Lowther, Irven L. Friedhoff, Springfield, for appellant.

HOUSER, Commissioner.

This is the appeal of Bobby Lee Shuler from a judgment of conviction and sentence to 99 years' imprisonment following a jury verdict of guilty of second degree murder. This Court has jurisdiction under § 3, Art. V, Constitution of Missouri, 1945, V.A.M. S., as provided by that section prior to the amendment adopted as the special election of August 4, 1970, since the notice of appeal was filed prior to January 1, 1972. Art. V, § 31.

From the evidence the jury could find these facts: A number of truck drivers for Tri-State Motor Transit Company, members of Teamsters Union Local No. 823, were on strike against Tri-State. Appellant, a striking truck driver for that company, borrowed a 30-30 rifle and some ammunition from another member of the union for the express purpose of firing at and disabling Tri-State trucks operating on the highways during the strike. He wrapped the rifle in a blanket to conceal it from view and put it in his car. On September 29, 1970 appellant left Joplin with a Mrs. Kimmel and Mr. and Mrs. Bowen in the

Kimmel car. Before leaving Joplin appellant removed the borrowed rifle from his car and placed it in the Kimmel car. Appellant had been drinking beer and whiskey during the afternoon and evening before leaving Joplin. The four drove to Springfield, purchased an 8-pack of beer, and drove south, where they met a Tri-State truck coming from the opposite direction on Highway 65. At appellant's direction Mrs. Kimmel, driver of the car, turned around, overtook the Tri-State truck, and appellant leaned out of the right-hand front side of the car, aimed at the truck and fired two shots into the grille on the front of the truck. Mr. Bowen then fired a shot at the Tri-State truck, thereby disabling it. Ten days prior to this date, while traveling on the highway south of Springfield, with Mrs. Kimmel driving, appellant had fired two shots at a Tri-State truck, striking its grille. Sometime after 1 o'clock on the morning of September 30, while the Kimmel car was being driven west on Interstate 44 between Springfield and Joplin, two Tri-State trucks were observed driving east. The first was a flat-bed truck; the second a tractor-trailer-van type. At the next exit Mrs. Kimmel crossed from the westbound lane over into the eastbound lane and followed the two Tri-State trucks. The van-type rig carried four reflectorized "EXPLOSIVES" placards on the side of the van. Appellant did not see the placards but, having driven Tri-State trucks for a year previously, he knew that about 50% of the cargo carried by Tri-State units consisted of explosives. The Kimmel car passed the two Tri-State trucks and proceeded some distance ahead of the trucks, left the eastbound lane, went up the ramp and crossed over the highway to the ramp leading to the westbound lane. Mrs. Kimmel stopped the car part of the way down that ramp at the direction of appellant, who told her he had to relieve himself. This done, appellant reached into the car, picked up the rifle (which he knew was loaded) and as the first of the two Tri-State trucks approached, traveling at top speed, he aimed at it and fired. It kept moving and appellant fired a second shot into the grille. By that time the second Tri-State truck, driven by John A. Galt, "was there" and appellant intentionally fired three shots into the grille of the second truck. On the third shot the bullet, traveling at from 2,000 to 3,000 feet per second, almost simultaneously initiated the detonation of 42,800 pounds of Gelex #1 dynamite then being carried in the enclosed van of the trailer. There was a tremendous explosion, a big blue flash, a big ball of fire which lighted up the sky all around "like the whole world was coming apart." The explosion blew the truck and its driver into bits (John Galt's left hand was found 465 feet from the site of explosion), blew out a crater in the highway approximately 50 feet wide, 70 feet in length, and 25 feet deep. The powerful concussion damaged or destroyed structures within a radius of several hundred feet, knocked appellant down, tore his shirt, blew the rifle out of his hands, totally shattered the windshield of the Kimmel car and blew it onto the front seat. The rifle was found approximately 263 feet from the rim of the blast crater, across the highway and by the westbound ramp, so that appellant was approximately 300 feet from the truck when he fired the rifle. One person seven miles from the blast felt wind and effects from the concussion. Appellant ordered the other three persons back into the car and, driving the Kimmel car himself, hastily left the scene of the explosion, driving on Interstate 44 to the next exit, where they left the interstate highway and drove on back roads. The car had a flat tire and appellant drove on the rim. The car finally came to a stop after running into an object in a farmyard. The four left the car, took to the open fields and fled in an attempt to escape, walking miles until daylight dawned. Finally, seeing airplanes flying about the area and hearing dogs barking, they gave themselves up.

Appellant testified that he did not mean to do any bodily harm to anyone; that he did not know what the truck was carrying; did not know that there was dynamite in

the truck, but did know "the danger of doing anything with dynamite" within the 2,000 foot range of the rifle; that he considered all explosives dangerous and had hauled dynamite a half dozen or dozen times, but in shooting at an enclosed tractor-trailer unit he never considered the possibility that it might be carrying dynamite; that he was wanting to disable the truck; that he did not fire at the trailer portion of the rig but was aiming at the grille, intending to disable the tractor; that it never entered his mind that he might hurt someone by shooting into the grille; that although the grille is about 2½ feet from the driver it never entered his mind that by shooting into the grille he would be shooting close to where the driver would be sitting; that the grille is 1 or 2 feet from the windshield but that in shooting at the grille he never considered the possibility of shooting a foot or two too high and striking the windshield; that he was shooting low to hit the motor block; that the fuel tank was about 6 feet from the front of the cab but that in shooting at the grille he never considered the possibility that in shooting at a low angle he might hit the fuel tank; that he never considered the possibility of striking a tire and causing a serious accident.

The jury was instructed under the felony-murder doctrine to find accused guilty of murder in the second degree upon a finding that he caused the death of John A. Galt by willfully and maliciously shooting a bullet from a 30-30 rifle in an attempt to shoot into a tractor motor vehicle pulling a trailer.

Appellant complains that the court erred in submitting the case solely under the felony-murder doctrine and in failing and refusing to give an instruction on manslaughter; that a manslaughter instruction must be given whenever there is any indication of a lack of malice and whenever the evidence, however slight, indicates that the crime was manslaughter; that his testimony as to his intentions would support a finding that he fired the rifle without malice; that if the jury found no malice under § 562.070 (which specifically requires malice) the underlying crime would not have been available as a felony on which to base a felony-murder submission, but the jury was not permitted to consider the possibility that the attempt to disable the tractor was made without malice. Appellant further contends that the crime of shooting into a motor vehicle is not statutorily defined as a felony and was not a felony at common law, and therefore the felony-murder doctrine was improperly applied.

■ Appellant was charged with second degree murder under the felony-murder doctrine. This state follows the common-law rule that where a person is killed by one who is perpetrating or attempting to perpetrate a felony the criminal act is murder. State v. Jewell, Mo.Sup., 473 S.W.2d 734, 738–739 [1–5]. The evidence establishes that this homicide was committed in the perpetration of a felony, namely, willfully and maliciously shooting into a motor vehicle in violation of § 562.070.[1] The felony in question is not one of those listed in § 559.010 and therefore the crime could not be first degree murder under that section. It is not manslaughter within the statutory definition of that offense. § 559.070. See in this connection State v. Davis, Mo.Sup., 400 S.W.2d 141, cert. den. 385 U.S. 872, 87 S.Ct. 142, 17 L.Ed.2d 99. Here the existence of legal malice is conclusively shown. Accordingly, it is murder in the second degree under § 559.020, which provides that all other kinds of murder at common law, not declared by statute to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the

1. The crime proscribed by § 562.070 is a felony, State v. Mills, 352 Mo. 774, 179 S.W.2d 95, 97, because it is *punishable* by imprisonment in the penitentiary. § 556.020, RSMo 1969, V.A. M.S.; State v. Garner, 360 Mo. 50, 226 S.W.2d 604, 606 [1]; State v. Kollenborn, Mo.Sup. en Banc, 304 Mo. 855, 856 [1]; State v. Combs, Mo.App., 301 S.W.2d 529 [2].

second degree. State v. Robinett, Mo.Sup., 279 S.W. 696.

All the evidence including appellant's own testimony proves conclusively that this shooting was both willful and malicious. "Willfully" means "intentionally" or "knowingly." State v. Marston, Mo.Sup., 479 S.W.2d 481. Appellant frankly admits that he borrowed the rifle for the express purpose of shooting at Tri-State trucks; that he traveled the highways in search of Tri-State trucks and after sighting the Tri-State unit driven by John A. Galt laid in wait and fired point-blank at it. "Maliciously" means "the intentional doing of a wrongful act without just cause or excuse." State v. Mosley, Mo.Sup., 415 S.W.2d 796, and cases cited l. c. 798 [1]. Appellant admits that his act was intentional. Reasonable minds could not differ on the proposition that the admitted act was wrongful and without just cause or excuse; there is no room left for any other inference.

▇▇▇ Appellant's protestation that he did not intend to hurt anybody is no excuse and does not serve to reduce the crime from second degree murder to manslaughter. A man is presumed to intend the natural and probable consequences of his intentional acts, State v. Martin, 364 Mo. 258, 260 S.W.2d 536, 539, particularly where his conduct is unlawful and dangerous to the safety and lives of others. General criminal intent is found "when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result. One cannot excuse the probable consequences of his own voluntary act by claiming that he had a mental reservation and performed the act or acts voluntarily done without an intent." 22 C.J.S. Criminal Law § 35, quoted with approval in State v. Anderson, Mo.Sup. en Banc, 384 S.W.2d 591, 607 [34]. At common law where a person was killed by one who was perpetrating or attempting to perpetrate a felony the criminal act was murder, although casual

and unintentional. State v. Robinett, supra. An unintentional homicide committed by one who at the time is engaged in the commission of a felony is murder even though the statute requires a premeditated design to effect death as the requisite of murder. Idem. The jury could not have found appellant guilty of less than murder in the second degree even if they had believed his testimony as to his intentions because the homicide was an incidental consequence of the attempt to perpetrate the felony proscribed by § 562.070. State v. Robinett, supra, 279 S.W. 1. c. 700 [13]. Just as design to take human life is unnecessary to make homicide committed in the perpetration of arson murder in the first degree, State v. Meadows, 330 Mo. 1020, 51 S.W. 2d 1033, so design to take the life of John A. Galt is unnecessary to make this homicide, committed in an attempt to perpetrate the felony proscribed by § 562.070, murder in the second degree.

It is appropriate to give a manslaughter instruction under § 562.070 where there is a jury question whether the shooting was willful and malicious, for instance where there is "substantial evidence that the accused was shooting at a fleeing burglar or prowler and unintentionally shot into a neighbor's house and killed someone," State v. Mills, 352 Mo. 774, 179 S.W.2d 95, but this is not such a case. As stated in Mills, 179 S.W.2d 1. c. 97 [3]: " * * * And we agree that the homicide here was murder as a matter of law if appellant's causative act in shooting into the dwelling house was a felony under Sec. 4425. [Now § 562.070.] State v. Robinett, Mo.Sup., 279 S.W. 696, 700 (VI). But the statute says the shooting into the dwelling house must be done wilfully and maliciously to constitute the crime it denounces. If that fact be conceded or found by the jury then the law will supply the malicious intent as to the resulting homicide, and accident or lack of actual homicidal intent will not be a defense." The instant case exemplifies the latter situation. There was no error in refusing an instruction on the law of manslaughter.

Appellant next complains of the admission in evidence of the television film showing an officer firing the rifle admitted in evidence at and detonating a quantity of Gelex #1 dynamite placed behind a mock-up of the side of a Fruehauf trailer. It is objected that the experiments filmed were conducted by laymen not qualified as experts in firearms or explosives, under substantially changed conditions, and that the jury was inflamed by showing the officer aiming the gun directly at the mockup and dynamite, thereby implying that appellant aimed directly at the dynamite at the time he fired the shots, as a result of which the emotions of the jury were aroused to appellant's prejudice.

The 5-minute film, offered in evidence for the purpose of demonstrating the capability of a shot from this rifle to detonate dynamite, was the subject of extensive inquiry outside the hearing of the jury before the court ruled on its admissibility. The branch manager of the trailer company testified that the 40 x 48 inch mockup, assembled in the service shop, covered with double-skinned .017 gauge stainless steel spot-welded on a metal frame, was a fair and accurate representation of the actual side of a Fruehauf trailer. It had quarter inch plywood backing on the interior with an inch and a half air space between skin and plywood, as is the case in the construction of actual trailers. Sergeant Glenn M. Wilson of the state highway patrol, who conducted the test at a firing range at a military fort, testified that he used the same 30-30 rifle used by appellant; that he loaded it with shells having soft-nosed bullets (hard nosed bullets have more penetrating power); that seven sticks of Gelex #1 dynamite were taped together and placed behind the mockup; that the shells placed in the rifle fit the weapon; that the rifle was fired at a distance of 316 feet from the test section. Some objectionable matter was ordered deleted from the film. Appellant's objections and the comments of court and counsel in connection therewith occupy 15 pages of transcript. After the objections were sustained in part

and overruled in part the jury heard Sgt. Wilson describe the above preparations and the fact that the seventh shot fired detonated the dynamite and caused an explosion The first six shots penetrated the mockup but did not hit the dynamite, which prior to the firing had sagged and become displaced. The rifle, the ammunition, the distance, the target, the mockup, the dynamite, etc. were either identical or essentially similar to the conditions existing at the time in question. Experts in the field of taking motion pictures testified concerning the movie equipment used in taking the film, the filming, and that the film was a fair and accurate representation of what transpired during the test. Two officers of the law who were present testified as to the fairness and accuracy of the representation. An expert in the field of explosives testified concerning the properties of Gelex #1 dynamite; the characteristics of nitroglycerin; what happens on detonation; the impact necessary to detonate dynamite; that a 30-30 rifle can provide velocities of from 2,000 to 3,000 feet per second, depending upon the ammunition used; that the threshold velocity of a projectile to initiate dynamite is about 125 feet per second at a distance of up to half a mile; that a 30-30 bullet fired from a 30-30 rifle traveling 2,000 to 3,000 feet per second, fired at Gelex #1 dynamite within a range of half a mile, would provide more than sufficient impact to detonate it.

Appellant's counsel conducted extensive cross-examination of the witnesses, eliciting that the test was conducted in the afternoon of a sunny day whereas the shots were fired at the Tri-State truck at night; that the test shots were fired at a stationary target on nearly the same plane with the rifle whereas appellant shot down at an angle at a moving target; that the sight on the rifle had been modified by the sergeant; that there was no proof that the shells used in the test contained the same amount and kind of powder as those used on the night in question; that the amount of explosives used in the test was substantially different from the amount of explosives in the truck;

that there was no evidence that the velocity of the shells used in the test were the same as the velocity of the shells found on the ground at the scene.

█ No abuse of discretion and no error is found in the admission of the film in evidence and its exhibition to the jury. The film was properly authenticated; it was relevant to the issues; it was not merely cumulative, and it did not violate the established rules of evidence. 62 A.L.R.2d 686. Appellant denied that he shot at the trailer portion of the rig, and did not admit that his shot had pierced the trailer or that his shot detonated the dynamite. As pointed out by the trial judge there was a live issue whether the shot could detonate the dynamite. The surrounding physical conditions under which the film was shot and the equipment used in the photography were explained. Numerous witnesses testified that the film was a fair and accurate representation of what transpired during the test. There is nothing to indicate that the film would tend to confuse the jury. On the contrary, the film may be said to have aided the jury in a more intelligent understanding of the facts and determination of the issues. The dissimilarities were not sufficient as a matter of law to impeach the value of the film as an aid to the jury in ascertaining the truth or to demonstrate an abuse of discretion on the part of the trial court. State v. Lusk, Mo.Sup., 452 S.W.2d 219, 224; Morris v. E. I. DuPont de Nemours & Co., 346 Mo. 126, 139 S.W.2d 984; Philippi v. New York, C. & St. L. R. Co., Mo.App., 136 S.W.2d 339, 344; Wren v. St. L. Pub. Serv. Co., Mo.Sup., 333 S.W.2d 92; Oglesby v. St. L. Pub. Serv. Co., Mo.App., 338 S.W.2d 357, 363 [6].

█ Appellant's last point is that appellant's right to due process of law was violated when the prosecuting attorney changed and altered physical evidence before trial. It appears that in the presence of the prosecuting attorney several rifle shells found at the scene of the explosion were fired at the dynamite during the test at the fort and the sighting mechanism on the rifle was adjusted for accuracy in firing but that appellant and his counsel prior to trial were not notified of "this freehanded alteration of physical evidence," thereby violating the fair play doctrine and violating due process. Appellant cites Nash v. Illinois, 389 U.S. 906, 88 S.Ct. 222, 19 L.Ed.2d 223, and Ashley v. State of Texas, 5 Cir., 319 F.2d 80, as indicative of the thrust of the doctrine. These cases involve failure of a prosecuting attorney to reveal evidence in his possession or knowledge favorable to the accused and of vital significance in planning and conducting defenses. No such situation is present in this case. There is nothing to indicate that appellant was entitled to this information prior to the trial in order to insure fairness, or that he was prejudiced by the acts in question. We find no error in this regard. State v. Spica, Mo.Sup., 389 S.W.2d 35, 51; State v. Coleman, Mo.Sup., 441 S.W.2d 46; State v. Aubuchon, Mo.Sup., 381 S.W.2d 807, 815.

Judgment affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C. is adopted as the opinion of the Court.

All of the Judges concur.