Robert WILLHITE, Ann Willhite and
Riviera Lanes, Inc., a corp.,
Plaintiffs-Respondents,

v.

MARLOW ADJUSTMENT, INC., a corp.,
Defendant-Appellant.

No. 40531.

Missouri Court of Appeals,
Eastern District,
Division One.

July 21, 1981.

William Sitzer, S. E. Poludniak, Dubail, Judge, Kilker & Maier, St. Louis, for defendant-appellant.

Fred Roth, Clayton, for plaintiffs-respondents.

KELLY, Chief Judge.

Appellant, Marlow Adjustment, Inc., a corporation, appeals from an adverse judgment of the Circuit Court of the City of St. Louis in a declaratory judgment action instituted by the respondents, Robert Willhite, Ann Willhite and Riviera Lanes, Inc., a corporation, for a declaration of the respective interests of the parties in a $25,000.00 draft made payable to the parties as part of a settlement of a claim for losses suffered by the respondents by reason of two fires. We affirm.

This action had its origin in two fires—one on August 26, 1975, and the other on August 30, 1975—which damaged a building leased by Riviera Lanes, Inc. and the bowling equipment and other personal property the Willhites employed in the operation of a bowling alley and businesses ancillary thereto.[1] The respondents, at the time of these fires, were covered by a valued fire insurance policy with the Proprietor's Insurance Company (hereinafter "Proprietors") in the amount of $275,000.00, and another such policy with Millers Mutual Insurance Company (hereinafter "Millers") in the amount of $1750.00.

On August 29, 1975, the respondents entered into a contract with appellant, a licensed public adjuster, to assist them in the adjustment of their loss sustained in the fire of August 26, 1975. For its service appellant was to receive ten percent (10%) of any amount received by the respondents from the insurance.[2]

Thereafter, on August 31st, and October 22, 1975, respondents signed two more identical contracts with appellant. The second contract was for the fire of August 30, and the third for those items of personal property owned by the Willhites destroyed in the fire of August 26, 1975, and covered by a home-owner's policy issued to the Willhites by Millers.

---

1. These included a snack bar, a cocktail lounge, a billiard room, a pro shop and an arcade with a coin operated pool table, three juke boxes, a Foosball table, three gun machines, four or five flipper games, a shuffleboard alley, two T.V. games, one hundred lockers owned by the corporation and 200 trophies won by the members of the family and situated in a trophy room. The Willhites were paid $1750.00 by the Millers Insurance Co. through Marlow's efforts and Marlow's fee for service rendered in connection with this settlement is not at issue in this appeal.

2.      MARLOW ADJUSTMENT INC.

4401 Hampton Ave.
St. Louis, Mo. 63109
August 29, 1975
Gentlemen:

As owner of property situated at City Route 66 East, St. Robert—Content damaged by fire on August 26, 1975, I (we) hereby authorize you to assist me (us) in the adjustment of my (our) loss with the insurance companies or associations insuring the above, for which service I (we) agree to pay you on receipt of my (our) drafts in payment of said loss the sum equal to 10% of the amount of adjustment. I (we) assign to Marlow Adjustment Inc., all moneys due or to become due to the extent of the fee for adjusting of said loss. It is understood that no settlement is to be made without my (our) approval.

/s/xRobert L. Willhite
/s/xAnne M. Willhite
Assured

Accepted
Marlow Adjustment Inc.
/s/ Ron Warren

On the morning of August 30, 1975, Raymond Davis, President of appellant, and Edward Lohmann, a fire loss estimator employed by appellant, met with Mr. Willhite for the purpose of inspecting the premises where the fire had occurred and estimating the loss sustained by the respondents by reason of the first fire. Mr. Davis and Mr. Lohmann learned of the second fire which had occurred earlier that same morning when they went to the bowling alley site—there were still some hot spots in the building and some smoke was still visible. Mr. Willhite met them at the bowling alley, they spent about 45 minutes inspecting it, and then went to the Willhite home where they occupied the rest of the day and evening making up an inventory of the items lost in the fire and an estimate of the value of the property loss the Willhites suffered.

After the first fire was reported Proprietors engaged the General Adjustment Bureau (hereinafter "G.A.B.") to investigate respondents' loss and a Mr. Jim McAliney, representing G.A.B. appeared at the bowling alley the day after the first fire, August 27, 1975, conducted an inspection of the premises, and conversed with Mr. Willhite. Mr. McAliney was seen by Mr. Willhite on two subsequent occasions; once at his home and another time at the bowling alley, but he did not talk with Mr. McAliney on either of these occasions because Mr. Davis had advised him not to do so.

Daniel Rabbitt, an attorney-at-law, was employed by Proprietors sometime in September, 1975, to coordinate the investigation and defend any suit that might be filed.

Appellant undertook gathering information necessary for the adjustment of the respondents' claim, including the preparation of a proof of loss for Proprietors, submitting it on or about October 23, 1975. This proof of loss was rejected by Proprietors on November 25, 1975, because the single proof of loss submitted covered "two separate fires and two separate claims, . . ." Appellant was directed to resubmit two separate Proofs of Loss specifying separately the property damage in each fire,

the exact amount of the actual loss, and the insureds' claim for each fire. According to this Proof of Loss the amount claimed under the policy was $329,640.80.

Appellant then prepared a separate Proof of Loss for each of the fires as directed by Proprietors. The amounts claimed under these were $129,850.41 for the August 26, 1975, fire and $199,790.39 for the August 30, 1975 fire; a total of $329,640.80. These Proofs of Loss were dated November 12, 1975.

In preparing the inventories and Proofs of Loss, it was necessary to establish the amount of the loss and this required that the value of various items damaged or destroyed in the fires be ascertained. Mr. Lohmann and other employees of appellant undertook this work. Invoices showing purchase prices were obtained from the Willhites and with the aid of these and other information Mr. Lohmann had, he assisted Mr. Davis in arriving at what they judged to be a fair market value, less depreciation, that would be incorporated in the respondents' claim. In conjunction with this phase of his work, Mr. Lohmann went to Kansas City where he interviewed Mr. Todd, a representative of the Brunswick Corporation, the mortgagee under a chattel mortgage on the bowling lanes and pinsetters, who furnished him with information about the Brunswick equipment in the bowling alley and its cash value. For the purpose of establishing the value of the items damaged by the fire, Mr. Davis and Mr. Lohmann contacted various persons and firms who were knowledgeable of these values, examined catalogs to ascertain the prices of other items, and formed an opinion of the replacement costs, less depreciation, of these items and incorporated them into Proofs of Loss filed with Proprietors and sent to G.A.B. Thereafter, Mr. Davis had numerous conversations with Mr. McAliney concerning the respondents' loss, on the phone as well as in person. He presented Mr. McAliney an inventory based on replacement costs and subsequently with a revised list of the inventory and cost. He and Mr. McAliney "tentatively agreed" that

the Willhites' loss was $286,000.00, or a little more. In his opinion the claim was settled with Mr. McAliney for this amount but Proprietors would not pay the claim because Mr. Willhite would not submit to a polygraph test.

When no settlement was forthcoming Mr. Willhite and Mr. Davis met in Jefferson City on January 15, 1976, and visited with the Director of Insurance of the State of Missouri to see whether the state would do anything to assist them in getting the claim settled. Thereafter, the Willhites and Mr. Davis were notified by a letter of January 16, 1976, from Mr. Hebenstreitt, Proprietors' Claims Manager, that the fire of August 30, 1975, was started intentionally by someone and that he and Mr. Rabbitt had discussed the possibility that Mr. Willhite should submit to a polygraph examination and if all went well the matter could be brought to a conclusion much sooner than could be done if it was necessary for Proprietors to conduct a full scale investigation.

On January 22, 1976, Mr. Willhite responded to Mr. Hebenstreitt's letter of January 16, 1976, stating that he possessed no knowledge that the fire of August 30, was intentional or whether it was a part of the investigation and called upon Proprietors to complete the matter as soon as possible because, in his opinion, Proprietors was employing delaying tactics and had sufficient time to complete its investigation.

On January 26, 1976, Mr. Hebenstreitt wrote to the Willhites rejecting their Proofs of Loss of December 3, 1975, "on the grounds that the claims in both instances have been overstated," and told them to resubmit Proofs of Loss "reflecting actual cash value of each loss," reserving, however, the right to reject any new Proofs of Loss for arson, fraud or misrepresentations, available to the company under the terms of the policy or by law. On February 25, 1976, the Director of Insurance wrote Mr. Davis and advised him that the Legal Section of the Division of Insurance was of the opinion that requiring claimants to take a polygraph test might be a violation of the claimants' right to privacy under the Constitution and the Federal Right to Privacy Act, and that it might also be a violation of Rule 10.6, Para. 2(c), 2(d), 2(e) of the Code of State Regulations, but that this would be a matter only an insured could raise.

On June 2, 1976, Mr. Davis wrote to the Director of the Division of Insurance of the State of Missouri concerning Proprietors demand that Mr. Willhite submit to a polygraph test and stated that, in his opinion, by demanding that his client submit to the test, the insuror was not acting in good faith because the Willhites had complied with all of the policy provisions and he requested that the Division of Insurance assist in having Proprietors carry out its part of the insurance contract.

On this same date, June 2, 1976, Mr. Davis also wrote to Mr. Rabbitt advising him that Mr. Willhite did not feel Proprietors' request for a polygraph test was part of the contract of insurance and that it violated Mr. Willhite's right to privacy. He asked that the claim for the August 26 fire be settled on the basis of the Proofs of Loss submitted.

Mr. Hebenstreitt replied to this letter of Mr. Davis, stating that because of the "arson and other circumstances involved" although Proprietors "cannot legally compel Mr. Willhite to take a polygraph test, . . . nevertheless, we feel this request is a reasonable one under the circumstances and he certainly should be willing to take the test to clear up this matter, so that we can resolve it promptly." [3]

3. The appellate courts of Missouri have not, so far as we have been able to discern, passed upon the question of the legality of requiring a claimant to submit to a polygraph test. The Court of Appeals of Tennessee, Eastern Section, in *Walker v. Tennessee Farmers Mut. Ins. Co.*, 568 S.W.2d 103, 105[1] (1977), has held that language in a standard liability insurance policy covering theft of the covered motor vehicle requiring the named insured to "submit to examination under oath by anyone designated by the company, subscribe to same, . . ."—identical with the language employed in the Insureds' "Duties in the Event of Loss Occurrence, Claim or Suit" subparagraph (3) of Proprietors' policy in this case—was not sufficient-

On June 9, 1976, the Division of Insurance replied to Mr. Davis' letter of June 2, 1976, and advised him that in March of 1976, a member of its legal staff had been advised that Proprietors did not intend to pay this claim and would defend any ensuing litigation; that the Division of Insurance's investigation revealed that the insuror had not assumed an arbitrary position and that the area in dispute could only be resolved in court, and the Division had no authority to act under those circumstances.

When it became clear that, unless Mr. Willhite submitted to a polygraph examination, Proprietors would not settle the loss and almost one year had elapsed since the two fires, Mr. Davis and Mr. and Mrs. Willhite went to the law firm of Rothman & Roth on August 23, 1976. Mr. Davis was present in the office when respondents discussed their claim with Mr. Roth and Mr. Rothman and a contract was entered into for the law firm to represent them in the matter. Mr. Davis was one of the signatories of this contract the Willhites executed with the firm of Rothman & Roth. He also paid $100.00 attorneys' fees for local counsel in Springfield, Missouri, where a lawsuit was filed in the United States District Court against Proprietors on the policy of insurance for the respondents' loss occasioned by the two fires.[4]

After the lawsuit was initiated Mr. Davis assisted Mr. Roth in the preparation of answers to interrogatories served upon the respondents by Proprietors. According to Mr. Roth's testimony at trial, Mr. Davis came to his office on one or two occasions and went over the lengthy lists of the losses in each fire. Mr. Davis also went over the policy with Mr. Roth, discussed its provisions and cited a couple of cases to Mr. Roth applicable to these policy provisions. Mr. Roth had never seen a fire insurance policy of this kind before, and Mr. Davis' greatest help to him was in answering one or two questions with respect to furnishing of the Proofs of Loss and the itemizing of each item claimed to have been lost in the fires. These Proofs of Loss prepared by appellant were attached as exhibits to the Answers to Proprietors' interrogatories directed to the respondents.

The respondents settled the suit in federal court for $155,000.00 and when Mr. Davis learned of the settlement he wrote to Mr. Rabbitt and advised him that he claimed for appellant, a lien on the insurance company's drafts for 10% of the total settlement, or $25,000.00. Two drafts were issued by Proprietors, one in the amount of $130,000.00, payable to the Willhites and Rothman & Roth, and the other in the amount of $25,000.00 payable to the Willhites, Rothman & Roth and Marlow Adjustment Company.

The Willhites and Riviera Lanes, Inc., instituted this Declaratory Judgment Action against appellant in the Circuit Court of St. Louis County, praying for a declaration (1) that appellant had performed no services toward obtaining the $155,000.00 settlement paid respondents by Proprietors, (2) what interest, if any, Marlow had in the $25,000.00 settlement draft, and (3) that the

ly broad to require a policy holder to submit to a polygraph examination.

Since 1945, it has been the law in Missouri that the results of polygraph examinations are inadmissible as evidence in a criminal trial because they lack scientific support for their reliability. *State v. Cole*, 354 Mo. 181, 188, 188 S.W.2d 43, 51[13] (1945). This holding was reaffirmed in *State v. Weindorf*, 361 S.W.2d 806, 811[17] (Mo.1962), and more recently in *State v. Biddle*, 599 S.W.2d 182, 185[1, 4, 6] (Mo.banc 1980), where the Supreme Court held that even the defendant's stipulation to the admissibility of polygraph examination results *did* not cure the problem of the unreliability of such evidence. See also *State v. Lieberknecht*, 608 S.W.2d 93, 101[19] (Mo.App.1980).

We are not required to rule on this question here because it is not relevant to the issues framed by the parties to this appeal.

4. While neither the trial court nor this court were furnished with copies of the petition filed in the federal court in Springfield, Missouri, we detect from a letter from Rothman & Roth to the Willhites, filed as an exhibit in this case, that the petition was in three counts. In counts one and two the petitioners prayed for damages for each of the fires, plus damages for vexatious refusal to pay, interest, attorneys' fees and costs. Count three was for $71,000.00 actual damages for inability to carry on the business and make payments to Brunswick, plus $250,000.00 punitive damages.

court direct and compel appellant to endorse its name on the $25,000.00 settlement draft, for reasonable attorneys' fees, and for their costs expended in the suit. Appellant initially challenged the venue of the case and by consent of the parties it was transferred to the Circuit Court of the City of St. Louis where appellant filed its Answer and Counterclaim. Appellant's Counterclaim was in two counts. Count one sued for breach of contract and damages in the amount of $25,217.72, plus interest from March 26, 1977, and court costs. Count two sought a declaration that appellant had duly performed all of the conditions of its contracts with the respondents and that the court further declare that the Willhites had no interest in the $25,000.00 draft but that it alone had the interest therein; that the Willhites be ordered to endorse their names on the draft; and that it be awarded a reasonable attorney's fee and court costs.

The respondents filed a Reply which constituted a general denial of the allegations of both Counts of appellant's Counterclaim.

The cause proceeded to trial to the court without a jury, and at the conclusion of the evidence was taken as submitted. Subsequently, the trial court entered "Findings of Fact, Order, Judgment and Decree," wherein it found: (1) that appellant did not perform any claims adjustment service or any other service in any way related to the respondents' fire losses and to the fee service contracts executed by the parties, in that the efforts of appellant pursuant to the contracts "did not produce or contribute to produce the payment of the sum of" $95,427.20 to the Brunswick Corporation, which was a loss payee on the Proprietors' fire insurance policy, and that the respondents owed this sum to Brunswick for the bowling equipment which was extensively damaged in the fires; that this sum was paid to Brunswick by Proprietors following Mr. McAliney's investigation as it was required to do under the terms of the insurance policy. Therefore, appellant was not entitled to any compensation regarding this payment. (2) That appellant was entitled to a fee of $175.00 on the contract of October 22, 1975, for services rendered on the claim on the Millers Mutual Insurance Company's policy and the settlement of $1,750.00. (3) That appellant did not perform any claims adjustment service or any other service in any way related to the two fire losses of the respondents pursuant to the contracts of August 29, and 31, 1975, in that appellant's efforts under those contracts did not produce or contribute to produce the $155,000.00 settlement with Proprietors; rather, that the settlement was the result of the filing of the lawsuit by Rothman & Roth, was the balance of the loss sustained by the respondents after deducting the loss sustained by Brunswick; that appellant was, under the contracts, entitled to payment of the contract fee provided only if it assisted the respondents in the adjustment of the loss, and this it did not do. (4) That Mr. Davis, appellant's President, and the Willhites agreed that after Proprietors paid Brunswick that the filing of a lawsuit was the only step remaining and that without such action Proprietors would make no payment of the losses, and that they were aware that there would be additional legal expenses and other losses incurred if this cause of action was pursued; that appellant agreed at the meeting of August 23, 1976, that it would amend its fee and service contracts to the extent that the 10% fee would not be due unless the settlement of the claim after initiation of a lawsuit would be in an amount in excess of the sum of $250,000.00, and said fee would apply only to any amount of a recovery in excess of that amount; that Mr. Davis agreed to this amendment to the services contract because:

(a) he took the position that these were "valued policies" in a sum of $275,-000.00, and since there were two fires, the total coverage afforded by the policy was in excess of that sum, and

(b) that a claim for $600,000.00 punitive damages would be part of any suit filed;

that for these reasons appellant was willing to continue to attempt to assist the respondents on the balance of their claim, ac-

knowledged that a lawsuit had to be filed and the service was outside the scope of its abilities and contracts, thereby admitting that its service up to that time had not produced an adjustment of the loss. (5) That Mr. Davis, as representative of appellant, had the authority to amend the contracts and did so because he realized that the chances of appellant receiving any fee on the remaining claims was virtually nonexistent.

■ The scope of review in this Declaratory Judgment Action is that prescribed in Rule 73.01.3a as interpreted in *Murphy v. Caron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). See also: *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 197[1] (Mo. banc 1977). According to this standard, the decree or judgment of the trial court will be sustained by the appellate court unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

■ In ruling on appellant's Points Relied On we choose to consider initially its third Point, i. e., whether the trial court's judgment is erroneous in finding that its contracts with the respondents were modified so that appellant was not entitled to any fee because respondents did not net more than $250,000.00 for their loss occasioned by the fires. We conclude the trial court's findings in this respect are supported by substantial evidence and are not erroneous.

The testimony of both Mr. and Mrs. Willhite support the trial court's findings. While Mr. Davis' testimony conflicted with that of the Willhites, in a bench tried case the trial court is the arbiter of the facts, and it may believe or disbelieve oral evidence in whole or in part, and this is true even where the evidence is uncontradicted. *Mattingly v. Bruckerhoff*, 603 S.W.2d 11, 12[1] (Mo.App.1980); *In re Marriage of Baker*, 584 S.W.2d 449, 450[2] (Mo.App. 1979). We defer to the trial court's acceptance of the testimony of the Willhites on this issue.

Appellant argues that the trial court erred in finding a modification because (1) the contracts were fully performed prior to August 23, 1976, and therefore were not subject to modification and (2) there was no consideration for a modification.

Appellant contends that it had done all it could do in the performance of its contracts with the respondents to effect an adjustment of this loss and that it was Mr. Davis who brought the Willhites to seek the legal services of Rothman & Roth on August 23, 1976, to pursue their legal rights under the insurance policy with Proprietors. Appellant's claim is based upon its contracts and, as we view these contracts it was not entitled to a fee until, and unless, an adjustment of the loss was achieved. The contracts specifically provide that the public adjuster's fee for its services will be paid upon receipt of drafts in payment of said loss by the Willhites.

■ The crux of this issue is whether the contracts were executed or executory on August 23, 1976, when, as the trial court found, the alleged modification of the contracts was effected. An executory contract may be modified by mutual agreement where modification affects the obligations of both parties. *Curry v. Boeckeler Lumber Co.*, 224 Mo.App. 336, 27 S.W.2d 473, 475[4] (1930).

The critical question for decision then is what appellant was required to do in the performance of its contracts and whether on August 23, 1976, it had done all that was required of it. To decide this issue we must look to the terms of the contracts to ascertain what appellant agreed to do for respondents.

Neither party has cited an appellate decision construing a public adjuster's contract and extensive research by this court has not brought one to our attention. However, the occupation of Public Adjuster is recognized in this state and since 1973 anyone wishing to engage in the occupation must first apply for and obtain a license. Ch. 325 RSMo. Supp.1973. Appellant, Mr. Davis and Mr. Lohman were licensed public adjusters at all times relevant to the issues in this case. By the statute, any person or

corporation engaging in the adjustment or settlement of claims for losses or damages arising out of policies of fire insurance is required to be licensed and the Superintendent of Insurance of this state, pursuant to authority granted him by § 374.045.1(3) RSMo. 1969, has issued regulation 190–12.-070(1), 4 C.S.R. 190–12.070(1) (1976)[5] whereby the term "adjustment or settlement of claims" as used in the licensing statute, is explained. According to this regulation the occupation of Public Adjuster includes any persons not otherwise exempted by that definition who negotiates with an insurer on behalf of an insured as to the amount or extent of a loss covered by a policy of fire insurance, including the acts of representing the insured or speaking on behalf of the insured to any agent or other person granted the authority to adjust claims by an insuror.

To comprehend the meaning of the terms "assist in the adjustment of my (our) loss" as they are employed in these public adjuster contracts we consider the function of one engaged in this occupation in conjunction with the duties imposed upon the insured by the terms of the policy before the insured will be indemnified.

Under the terms of the insurance policy Proprietors issued respondents there are certain duties imposed upon the insured which he must perform before he will be indemnified. These are set out in the General Conditions pages of the policy. Among these are that the insured shall (1) give immediate written notice to the company of the occurrence of the fire and this written notice must contain particulars sufficient to identify the Insured and also reasonably obtainable information with regard to the time, place and circumstances of the fire together with names and addresses of anyone injured thereby, (2) furnish a complete inventory of the destroyed and damaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed, (3) within sixty days after the loss, render a proof of loss stating the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, etc.

Anyone reading these, and the other duties imposed upon the insured by a fire insurance policy of this type, will appreciate that the adjustment of a loss can be an intricate and difficult undertaking. The function of the public adjuster is to aid or assist the policyholder in the preparation of inventories, loss statements listing damaged and undamaged merchandise or property, and other details involved in the handling of the loss.[6] He will also negotiate with the representative of the adjustment bureau in an effort to settle or adjust the cash value of the loss sustained by the policyholder. He may also arrive at a settlement with the insurance company. His dealings are entirely between the policyholder and the insuror or its agents.

■ A public adjuster may not, lawfully engage in the practice of law, nor may he prosecute or defend claims. He may not advise his client on the legal interpretation of the policy provisions. *Larson v. Lesser*, 106 So.2d 188, 192 (Fla.1958).[7]

■ We may now proceed to construe the subject contracts in the context of what was required of appellant under the terms of its contracts with respondents and ascertain whether the contracts were executed or executory at the time of the alleged modification.

The word "assist," means "To help; aid; succor; lend countenance to; participate as

5. Section 536.031.5 requires the courts of Missouri to take judicial notice, without proof, of the contents of the Code of State Regulations.

6. For the role of the public adjuster, see Adjustment of Property Losses, (3d Ed.) Reed & Thomas, Ch. 1, pp. 2–19; Fire & Property Insurance, Rodda, pp. 115–117.

7. A licensed public adjuster is not permitted, by reason of said license, to engage in the practice of law or to conduct law business. Sec. 325.015 RSMo. Supp.1973.

an auxiliary ... To contribute effort in the complete accomplishment of an ultimate purpose intended by those engaged." Black's Law Dictionary (4th Ed. Rev. 1968).

The word "adjustment" has been defined in a number of court decisions. It has been defined to be an agreement on the ascertainment of the policyholder's loss. *Gerhart Realty Co. v. Northern Assur. Company*, 86 Mo.App. 596 (1900); *Colonius v. Hibernia Fire Insurance Company*, 3 Mo.App. 56 (1876). In *Dworkin v. Caledonian Ins. Co.*, 285 Mo. 342, 226 S.W. 846, 850 (Mo. banc, 1920) said: "The word 'adjustment' is not a technical term. It means to fit, arrange, settle, equalize, and perhaps has other meanings, according to the subject matter where it is used." The Appellate Court of Illinois, in *Farley v. Security Ins. Co. of New Haven, Conn.*, 331 Ill.App. 448, 73 N.E.2d 662, 668[2, 3] (1947) defined the word "adjust" as meaning "settle" and said that as used in the field of insurance it meant "to determine the amount to be paid under a policy in settlement of a loss." The court cited Marshall on Insurance, 617, wherein "adjustment" is defined to be "the settling and ascertaining the amount of the indemnity which the insured, after all proper allowances and deductions have been made, is entitled to receive, and the proportion which each underwriter is liable to pay under the policy."

In 44 Am.Jur.2nd Insurance, § 1701, p. 613, the following is said concerning the meaning of the word:

The term "adjustment" is used in the law and business of insurance in more than one sense. Frequently it refers simply to the steps leading to an ascertainment of the amount of value or loss, or in the case of non-agreement between the parties, the steps preceding the selection of arbitrators or appraisers ...

An "adjustment" has also been defined as the settling and ascertaining of the amount of indemnity which the insured, after making all proper allowances, is entitled to receive, or the amount of the *loss* as so settled. In this sense it is used as equivalent to a promise to pay the loss so determined.

The question is discussed in 6 Appleman, Insurance Law and Practices, Ch. 170, pp. 645 and 646, where adjustment is distinguished from compromise and settlement. At p. 645 the author states:

The term adjustment includes negotiations which may precede a compromise and settlement and may even include the latter; since, after all, a compromise and settlement is primarily an 'accord and satisfaction.' An adjustment may also include steps leading to payment of a claim in full, when the investigation discloses liability of the insurer and damages equal to that claimed by the insured. On the other hand, compromise and settlement nearly always refer to the amicable satisfaction of a disputed claim, either as to the liability or amount of loss, leading to both parties giving up some of their claimed rights. Because of this distinction there may be some justification for the usage of the different wordings by the courts, and the terminology so used.

And at p. 646:

The term 'adjustment' has been used in the sense of meaning an ascertainment of the amount or value of a loss by the insured and a representative of the company. Similarly it has been said to constitute an accord, but not a satisfaction. An adjustment has also been defined as the settling and ascertaining of the amount of indemnity which the insured, after making all proper allowances is entitled to receive, or the amount of the loss as so settled.

In *Colby v. Parkersburg Insurance Co.*, 37 W.Va. 789, 17 S.E. 303, 305 (1893), the court held that an adjustment of the amount of the loss, and an agreement to pay the amount as adjusted are two distinct and independent things. An "adjustment merely amounts to an admission on the part of insurers that the sum fixed is due if the policyholder is to have anything under the policy and does not stop the insurer from setting up fraud on the part of the assured, or a breach of any of the conditions of the policy that operates to defeat the insuror's

liability. *Bond v. National Fire Ins. Co.*, 77 W.Va. 736, 88 S.E. 389, 395[6] (1916).

We believe that appellant's contract was still executory when the parties to this appeal met in the office of Rothman & Roth on August 23, 1976, and was modifiable regardless of whether the appellant's obligation under the terms of its contract with respondent required that it assist the respondents to adjust—i. e. agree upon the amount of the loss they sustained—or to settle—i. e. to agree both upon the amount of the loss and the liability of the insuror—their claim under the terms of the fire insurance policy.

The evidence supports a finding that there was no adjustment of the loss at that time. The only evidence that comes close to establishing that an adjustment had been achieved was Mr. Davis' testimony that he and Mr. McAliney had "tentatively agreed that the loss was about Two Hundred Eighty-six Thousand Dollars ($286,000.00) or a little bit in excess of that, but he [Mr. McAliney] had not submitted this to the company." Later, during cross-examination, he further testified that in his opinion he and McAliney "tentatively" had the loss settled; and finally, that he had a "tentative agreement" with Mr. McAliney what the loss should settle for but that there was no way he could settle the loss nor conclude a settlement without the insurance company's concurrence.[8]

If, on the other hand, appellant was to assist respondents in arriving at a settlement—i. e. a compromise and settlement—of their claims, there is no evidence that had been accomplished by August 23, 1976.

■ The question remains whether there was consideration to support the modification of these contracts. We hold that there was such consideration.

■ "Consideration is something moving from one party to the other; it can be in the form of a legal benefit or detriment . . . A valuable consideration 'may consist of some right, interest, profit or benefit accruing to one party, or some forebearance, loss or responsibility given, suffered or undertaken by the other.'" *Reed, Roberts Associates, Inc. v. Bailenson*, 537 S.W.2d 238, 240[1] (Mo.App.1976).

Viewed in the context in which Mr. Davis' statement waiving appellant's fee on the first $250,000.00 respondents should receive was made, we conclude sufficient consideration passed between the parties to support modification of the two contracts under consideration.

It was clear by August 23, 1976, that despite appellant's efforts to adjust the loss no adjustment had been made and litigation seemed almost inevitable. Proprietors would not discuss settlement of the claim until such time as Mr. Willhite submitted himself to a lie-detector test. Recourse had been had to the state insurance department to no avail. Respondents knew that when counsel was retained they would be obligated to incur attorneys' fees and would therefore receive a lesser amount of any recovery arrived at thereafter than if an adjustment or settlement had been arranged by appellant alone.

On August 23, 1976, while the parties were discussing the terms of a contract with the attorneys and the additional 15% to 20% contingency fee the attorneys wanted for their services, the respondents inquired what effect any attorneys' fees would have on what they would ultimately receive from the monies recovered on the insurance policies. The evidence is clear that the respondents did not agree to retain the law firm and to the fee arrangement with said firm until after Mr. Davis declared that they would owe appellant no fee unless they received more than $250,000.00 "net."

---

8. Unfortunately the trial court was not favored with the testimony of Mr. McAliney despite the fact he had been subpoenaed by respondents' counsel as a witness in the cause and appellant proceeded to put on its evidence after respondents' counsel informed the trial court that although he was having difficulty locating Mr. McAliney, the witness' testimony would be offered after appellant had finished its case. Mr. McAliney was characterized as "the elusive Mr. McAliney" by the trial court.

Appellant had an interest in seeing that respondents losses were paid because under the terms of its contracts it was to receive 10% of any amount paid respondents, and its fee was contingent upon respondents receipt of a draft of the insuror for these losses. As stated hereinabove, appellant, as a public adjuster, could not institute any legal proceedings against the insuror on the policy to recover respondents' losses and it became necessary to employ the service of a law firm that could institute litigation to recover those losses. By agreeing to waive its fee of 10% of any amount received by the respondents which netted them less than $250,000.00 appellant suffered a detriment; the Willhites, on the other hand, armed with the knowledge that they would not be liable to appellant for any fee for its services unless they received more than $250,000.00 net from Proprietors, were thus encouraged by appellant to retain counsel and pursue their legal remedies, and thereby increase the total amount of fees and expenses deductible from any monies recovered through the combined efforts of the lawyers and appellant. Respondents enjoyed a benefit by reason of Mr. Davis' waiver of appellant's fee as originally agreed upon. Furthermore, it is well settled that while an agreement made in substitution of a prior executory contract annuls the former contract and is itself a sufficient consideration for a release from its obligations, the substituted agreement must contain a change of the obligations of each party in order to constitute a consideration. *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327, 331[1] (Mo.App. 1954). There was a change of obligation on the part of each party present here. Respondents became obligated to incur and pay substantial attorney fees to pursue their legal remedies which might result in a recovery which could net them more than $250,000.00, and appellant became obligated to waive any fee it was entitled to on that sum under the terms of the original contracts.

We find no merit to appellant's contention that the modification of these contracts was ineffective because there was no consideration to support them.

Appellant also claims the trial court's judgment is erroneous in holding that it did not produce, contribute to produce nor assist in obtaining payment of $95,042.72 to the mortgagee, the Brunswick Company. We hold there is no error in this finding of the trial court.

In the policy of insurance which forms the basic document in this case there is a Loss Payable Clause protecting the Brunswick Corporation from any loss for property sold respondents under a chattel mortgage; such clause in a standard fire insurance policy creates an independent insurance of mortgagee's interest just as if it had received a separate policy from the insurors but without any inconsistent or repugnant condition imposed by the policy upon the owner of the insured property and free from invalidation by latter's act or neglect. *Syracuse Savings Bank v. Yorkshire Insurance Co.*, 301 N.Y. 403, 94 N.E.2d 73, 75[1] (1950); *Prudential Ins. Co. of America v. German Mut. Fire Ins. Ass'n.*, 142 S.W.2d 500, 502[2] (Mo.App.1940). The loss payable clause specifically provided: "Loss, if any, is payable to BRUNSWICK CORPORATION as its interests may appear." Under this clause the mortgagee, Brunswick Corporation, was entitled to have the balance on its mortgage satisfied from the proceeds of the insurance policy. *Colby v. Parkersburg Ins. Co.*, supra, l.c. 304. The trial court found that appellant did not produce or contribute to produce the payment of the sum of $95,427.20 to the Brunswick Corporation. Appellant argues that this finding was erroneous because it assisted the respondents in the preparation of those documents required of the insured under the terms of the policy including, among others, proofs of loss, giving of sworn statements, conditions precedent to any duty on the part of the insuror to indemnify the insureds for their losses.

Respondents argue that the trial court's findings are supported by the record, and we agree.

Mr. Davis testified that the proofs of loss prepared by appellant and filed with Proprietors valued respondents' loss—including

the bowling lanes, etc., subject to the Brunswick Corporation mortgage—at $329,-000.00. This was necessary, he testified, because to recover the entire amount of respondents' loss they had to prove the entire loss, not a portion of it. Further, he testified that his discussion with Mr. McAliney covered the entire loss, including the Brunswick Corporation's mortgage interest.

Mr. Rabbitt testified that after Mr. McAliney inspected the scene of the fires he informed Mr. Rabbitt that the building was a total loss, in excess of $100,000.00; that the settlement of Brunswick's claim was worked out by a lawyer representing Brunswick and Mr. Hebenstreitt, the claims manager for Proprietors. The amount paid Brunswick was the balance due on the mortgage according to Brunswick's proof of loss. At the time of this settlement with Brunswick the respondents disputed Brunswick's figures relative to the balance due on the mortgage. Mr. Rabbitt also testified that the Brunswick claim was paid because of the loss payable clause in the policy of insurance and not by reason of any actions of the appellant.

The respondents' evidence sufficiently supports the trial court's findings and judgment and we so hold.

Judgment affirmed.

STEWART and SNYDER, JJ., concur.